[No. 56376–4. En Banc. February 14, 1991.]

SEATTLE–FIRST NATIONAL BANK, ET AL, *Appellants,* v.
WASHINGTON INSURANCE GUARANTY ASSOCIATION,
*Respondent.*

*Robert L. Wilson* and *Karr Tuttle Campbell,* for appellants.

*Arnold J. Barer,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

This case involves "residual value insurance", a relatively new and highly specialized type of business–related insurance. At issue is whether the trial court properly characterized residual value insurance as surety insurance that is not protected by the Washington Insurance Guaranty Association Act, RCW 48.32. We hold that the trial court erred, and reverse and remand.

In August 1981, Seattle First National Bank (Sea–First) purchased a "Residual Value Protection Plan" from Integrity Insurance Company (Integrity) of Paramus, New Jersey. According to this agreement, Sea–First wished "to establish a future market for those new motor vehicles which it will in the future lease pursuant to closed–end leases," and Integrity was willing to purchase those leased vehicles from Sea–First "or otherwise indemnify the Bank on the terms and conditions and for the considerations hereinafter set forth."

Those terms and conditions stated that Integrity would provide Sea–First with a subscription to an automotive lease guide listing residual values of motor vehicles at specified future dates. Sea–First would then enroll its leased vehicles by sending Integrity a computer–generated form describing the year, make, model and vehicle identification numbers of vehicles leased that month. The enrollment form also listed the scheduled lease termination date and the residual value established by the lease guide.

At the end of the lease period, Sea–First could deliver the vehicle to Integrity, which was required to then purchase the vehicle for the "operative residual value" (determined by the lease guide) less deductions for excess mileage and wear and tear. Under the excess mileage provisions, the operative residual value of the vehicle was reduced under a computation whereby the miles on the odometer in excess of 1,250 miles per month of the original lease term were multiplied by 4 cents. Under the wear and tear provisions, the operative residual value of the vehicle was reduced by Integrity's estimated cost to place the vehicle in a legally saleable condition. This amount was computed as the cost necessary to (a) place the vehicle in good mechanical condition (ordinary wear and tear excepted); (b) replace any tire that wasn't part of a matching set of five tires or had less than one–eighth inch of tread at its shallowest point; and (c) repair scratches, dents and cracks longer than specified lengths and other damage not constituting ordinary wear and tear.

As consideration for Integrity's promise to purchase the leased vehicles, Sea–First promised to pay Integrity $250 per year plus 2 to 2.25 percent of the residual value of the enrolled vehicles. The Sea–First policy also provided for the recovery of all costs and attorneys' fees incurred to enforce any obligation under the policy.

In another transaction, this one in September 1982, Bill Pierre Leasing, Inc., doing business as American Leasing Company (American Leasing), purchased a "Leased Vehicle Residual Value Protection Policy" from Integrity. Under this policy, Integrity agreed to indemnify American Leasing against the "Ultimate Net Loss" sustained on an enrolled vehicle. American Leasing was to notify Integrity each month of the vehicles leased that month in order to enroll them. At the end of the lease period, American Leasing could deliver an enrolled vehicle to Integrity. Upon delivery, Integrity could pay either the ultimate net loss or purchase the enrolled vehicle for the adjusted residual value. The adjusted residual value would be the amount specified

in the automotive lease guide absent deductions for excess mileage and excess damage. The excess damage deduction included the cost to repair or replace any body damage and mechanical defects; minor body damage was not excluded from the deduction. The policy defined the ultimate net loss as the adjusted residual value minus the net realized value. The net realized value was the highest cash price that American Leasing could receive in a bona fide cash sale.

Unlike the Sea–First policy, the American Leasing policy stated that it did not apply to any enrolled vehicle for which the relevant lease was terminated prior to the scheduled lease termination date, whether by default of the lessee, prepayment or otherwise. The American Leasing agreement also contained no attorneys' fees provision.

In 1987, Integrity was declared insolvent by a New Jersey Superior Court. The court directed the state's insurance commissioner to liquidate and marshal Integrity's assets for the benefit of its policyholders and creditors.

As insureds of an insolvent insurance company, Sea–First and American Leasing made claims with the Washington Insurance Guaranty Association (WIGA) for sums allegedly due under their contracts with Integrity. WIGA denied these claims on the ground that the agreements in question constitute credit or surety insurance and are not the types of insurance protected by the Washington Insurance Guaranty Association Act, RCW 48.32.

Sea–First and American Leasing then filed the present action against WIGA in Thurston County Superior Court. On cross motions for summary judgment, the trial court agreed with WIGA that the agreements constituted surety insurance and thus were exempted from coverage under RCW 48.32. The court dismissed the insureds' complaint.

Sea–First and American Leasing then sought direct review, which this court granted.

Two issues are presented.

## ISSUES

ISSUE ONE. Is residual value insurance surety or credit insurance and thus exempted from coverage under the Washington Insurance Guaranty Association Act?

ISSUE TWO. Are the insureds entitled to recover their expenses and attorneys' fees from the Washington Insurance Guaranty Association?

## DECISION

ISSUE ONE.

CONCLUSION. None of the types of credit or surety insurance defined in Washington's insurance statutes describe the residual value insurance at issue in this case. We conclude that residual value insurance is not credit or surety insurance and is not excluded, therefore, from the Washington Insurance Guaranty Association Act.

The Washington Insurance Guaranty Association (WIGA) is a nonprofit unincorporated legal entity created by and existing pursuant to the Washington Insurance Guaranty Association Act (WIGA Act), RCW 48.32.[1] One purpose of the WIGA Act is to provide a mechanism for the expeditious payment of claims asserted by Washington policyholders against insolvent insurers.[2] WIGA accumulates funds resulting from assessments levied on member insurers and uses these funds to pay claims as they arise.[3] All foreign and domestic insurance companies which write direct insurance as set forth in RCW 48.32.020 are required to be members of WIGA as a condition of transacting business in Washington.[4]

---

[1] *Agency Budget Corp. v. Washington Ins. Guar. Ass'n,* 93 Wn.2d 416, 418, 610 P.2d 361 (1980); RCW 48.32.040.

[2] *Agency Budget Corp.,* 93 Wn.2d at 418; RCW 48.32.010.

[3] *Agency Budget Corp.,* 93 Wn.2d at 418; RCW 48.32.060, .070.

[4] *Agency Budget Corp.,* 93 Wn.2d at 418; RCW 48.32.040.

RCW 48.32.020 provides that the WIGA Act applies to "all kinds of direct insurance, except life, title, surety, disability, credit, mortgage guaranty, workers' compensation and ocean marine insurance." WIGA denied the claims at issue on the ground that they constituted credit or surety insurance. The issue thus is whether residual value insurance, a characterization used by all three parties to describe the Integrity agreements, constitutes credit or surety insurance as defined by Washington law.

Residual value insurance insures a definite, minimum value of an identified asset at a specific date in the future.[5] This definition clearly describes the purpose of the Sea–First and American Leasing agreements: to insure that leased vehicles would be worth a specified value, minus certain deductions, at the end of the lease agreement. The first question is whether this definition coincides with that of credit insurance.

Credit insurance is a form of surety insurance (RCW 48.11.080(1)) and general casualty insurance (RCW 48.11-.070(9)) and is defined as insurance against "loss or damage resulting from failure of debtors to pay their obligations to the insured".[6] This statutory definition is in keeping with the common definition of credit insurance as insurance that "relates strictly to indemnification of the insured for certain types of overdue accounts, particularly where insolvency of the debtor is concerned."[7]

As noted in the foregoing recitation of the facts of this case, the American Leasing policy excludes a leased vehicle from coverage when a lease is terminated by default of the lessee. While the Sea–First agreement contains no such provision, nowhere does it expressly provide coverage

---

[5]Cotton & Maneval, *Financial Guaranty Insurance,* in *Business Insurance Law and Practice Guide* 6–17 (1989).

[6]RCW 48.11.070(9).

[7]9 J. Appleman, *Insurance* § 5241, at 126 (1981); *see also* Black's Law Dictionary 722 (5th ed. 1979); Cotton & Maneval, at 6–29.

should the lessee, or debtor, default. The Integrity insurance does not protect Sea–First or American Leasing from the failure of lessees to make their lease payments, and does not appear to be credit insurance as defined by RCW 48.11.070(9).

■ WIGA argues to the contrary largely on the basis of two expert opinions. These experts relied on Integrity's filing practices (the company apparently filed its insurance forms as credit or surety insurance to avoid paying guaranty fund assessments) rather than legal authority to support their opinions that the Integrity insurance was credit insurance. We decline to accept the filing practices of a financially troubled insurance company as conclusive proof of the proper classification of its insurance.

■ Research has disclosed no legal authority for classifying residual value insurance as credit insurance. The National Association of Insurance Commissioners (NAIC) lists residual value insurance and credit insurance as separate entities in the Financial Guaranty Association Model Act.[8] Another treatise also discusses them as distinct types of insurance.[9] We conclude that residual value insurance is not credit insurance as defined by Washington law.

The next question is whether, under Washington law, residual value insurance constitutes surety insurance and is thus expressly exempted from coverage under the WIGA Act. RCW 48.11.080 defines surety insurance as including:

(1) Credit insurance as defined in subdivision (9) of RCW 48.11.070.

(2) Bail bond insurance.

(3) Fidelity insurance, which is insurance guaranteeing the fidelity of persons holding positions of public or private trust.

(4) Guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings, and contracts of suretyship.

(5) Indemnifying banks, bankers, brokers, financial or moneyed corporations or associations against loss resulting from

---

[8] *See* 3 Nat'l Ass'n of Ins. Comm'rs, *Model Insurance Laws, Regulations and Guidelines,* 626–2 (1987).

[9] Cotton & Maneval, at 6–17, 6–29.

any cause of bills of exchange, notes, bonds, securities, evidence of debts, deeds, mortgages, warehouse receipts, or other valuable papers, documents, money, precious metals and articles made therefrom, jewelry, watches, necklaces, bracelets, gems, precious and semi–precious stones, including any loss while the same are being transported in armored motor vehicles, or by messenger, but not including any other risks of transportation or navigation; also against loss or damage to such an insured's premises, or to his furnishings, fixtures, equipment, safes and vaults therein, caused by burglary, robbery, theft, vandalism or malicious mischief, or any attempt thereat.

■ Suretyship is a contractual relation whereby one person, called the surety, agrees to be answerable for the debt or default of another, called the principal.[10] Hence, surety insurance is commonly defined as insurance against defaults on the part of persons who have undertaken contract obligations.[11]

■ The first four types of surety insurance listed in RCW 48.11.080 fit the above description of surety insurance. Credit, bail bond, fidelity and guaranty insurance all contain some sort of suretyship relationship and insure against defaults by those who have undertaken contract obligations. Residual value insurance does not fit within those categories of surety insurance; it does not insure against contractual default and establishes no surety/principal relationship.

WIGA argues that RCW 48.11.080(5) illustrates that surety insurance in Washington need not contain a suretyship relationship. Subsection (5) describes indemnity insurance that protects banks and financial corporations from the loss of several types of assets, including money, resulting from any cause. It is apparent that this section of the surety insurance statute is directed at the physical loss of money rather than at a monetary loss created by diminution in value, which is the risk covered by residual value

---

[10]A. Stearns, *Suretyship* § 1.1 (5th ed. 1951); E. Spencer, *Suretyship* § 1 (1913).

[11]W. Vance, *Insurance* 1007 (3d ed. 1951); *see also* Black's Law Dictionary 1293, 722 (5th ed. 1979).

insurance. The residual value insurance herein has no indemnity function of the type described in RCW 48.11-.080(5), as it is not intended to provide reimbursement for loss resulting from breach of trust or a failure of employees or agents to perform their duties.[12] Moreover, the American Leasing agreement would not fit under subsection (5) of the surety insurance statute since the company is not a bank or financial corporation.[13] Thus, we do not perceive the insurance provided by Integrity to be surety insurance as defined by RCW 48.11.080(5).

WIGA also relies on expert opinion to establish residual value insurance as surety insurance. One expert reinforces his opinion that the surety insurance statute, RCW 48.11-.080, encompasses residual value insurance by again citing Integrity's filing practices. Yet another expert cites those practices to show that the insurance is *not* of a surety nature. As stated earlier, we decline to accept Integrity's filing practices as determinative of the issue presented.

WIGA also argues that residual value insurance is a form of financial guaranty insurance and, as such, serves a suretyship function. Financial guaranty insurance has been defined as insurance that guarantees financial obligations, typically the payment of principal and interest by a corporation to its creditors.[14] The NAIC recently defined financial guaranty insurance to include five different types of risk: (1) the failure of any obligor to pay principal or interest when due as a result of insolvency; (2) losses due to interest rate differentials; (3) changes in the rate of exchange of currency; (4) inconvertibility of one currency into another for any reason; and (5) changes in the value of

---

[12]*See* Black's Law Dictionary 692 (5th ed. 1979); 41 Am. Jur. 2d *Indemnity* § 1 (1968).

[13]*See* RCW 48.24.095.

[14]Note, *Financial Guaranty Insurance: Is it "The Business of Insurance" Under the McCarran Act?*, 1988 Colum. Bus. L. Rev. 855, 856 n.7.

specific assets.[15] The first risk category clearly does serve a suretyship function. One authority writes that the purpose of financial guaranty insurance is to ensure that a financial obligation created in a business transaction will be fulfilled. "As such, it is much like suretyship".[16] The risk that both sides in this case see as defining residual value insurance, however, is risk category (5) above, changes in value of specific assets. One commentator observes that this risk is less standard than the first. "There is no analogy to traditional surety insurance; the traditional principal obligor whose default is remedied by the insurer is missing. No indemnity is available to the insurer."[17] Thus, as we perceive it, risk (5), viewed by all parties herein as residual value insurance, serves no suretyship function. We therefore conclude that the residual value insurance involved in this case is not surety insurance under Washington law.

Sea–First and American Leasing maintain that residual value insurance is best categorized as property or vehicle insurance. Property insurance is defined in Washington as

> insurance against loss of or damage to real or personal property of every kind and any interest therein, from any or all hazard or cause, and against loss consequential upon such loss or damage.

RCW 48.11.040. Vehicle insurance is "insurance against loss or damage to any land vehicle . . . and against any loss or liability resulting from . . . use of any such vehicle".[18]

The problem with this argument is that residual value insurance is not intended to provide any compensation for

---

[15]Note, 1988 Colum. Bus. L. Rev. at 861; 3 Nat'l Ass'n of Ins. Comm'rs, at 626–1.

[16]Cotton & Maneval § 6.01, at 6–3. *See also* Note, 1988 Colum. Bus. L. Rev. at 867 n.87.

[17]*NAIC Model Act on Financial Guaranty Insurance: A Commentary,* 43 Bus. Law. 717, 721 (1988).

[18]RCW 48.11.060(1) (part).

physical damage.[19] The two Integrity agreements evidence this. The Sea–First agreement allows some compensation for minor physical damage to leased vehicles, as it deducts only the cost necessary to repair "excessive" damage, *i.e.*, scratches over 1 inch long on the body and dents longer than 3 inches in the grilles. The American Leasing deduction for excess damage is broader still, as it deducts the cost to repair, for example, any dents or scratches on the body and grille. While the provisions are allegedly "excess" damage deductions, they are so written to exclude compensation for almost all physical damage.

It is clear that both agreements are intended to compensate a lessor for a drop in the market value of its leased vehicles. One authority would bar such diminution in value insurance from consideration as property insurance:

> Property insurance covers direct loss to tangible property. It covers not only physical damage to the property but also loss of use of property that is actually damaged. In the usual property insurance contract there is no coverage for items of consequential loss, such as loss of use or diminution in value to property that is itself not physically damaged by an insured peril.

McCullough, *Property Insurance,* in *Practical Lawyer's Insurance Manual No. 1* 61 (1975).

Sea–First and American Leasing argue further that if the court refuses to see their residual value agreements as property or casualty insurance, it should hold that the "catchall" category of insurance applies. Under RCW 48.11.070, casualty insurance is defined to include insurance "[a]gainst any other kind of loss . . . properly the subject of insurance and not within any other kind or kinds of insurance as defined in this chapter, if such insurance is not contrary to law or public policy."[20]

■ As stated at the outset, the WIGA Act excludes only life, title, surety, disability, credit, mortgage guaranty,

---

[19]Cotton & Maneval, *Financial Guaranty Insurance,* in *Business Insurance Law and Practice Guide* 6–25 (1989).

[20]RCW 48.11.070(10).

workers' compensation and ocean marine insurance from its protection.[21] Sea–First and American Leasing argue that under the principle of "expressio unius est exclusio alterius"—specific inclusions exclude implication—these exclusions are exclusive.[22] The insureds also point to the requirement that the act be "liberally construed to effect the purpose under RCW 48.32.010 which shall constitute an aid and guide to interpretation."[23] Residual value insurance does not clearly fit the statutory definitions of credit or surety insurance. Neither does it appear to be an obvious example of property insurance. Until the Washington Legislature decides to address this type of insurance directly, we conclude that the best classification of residual value insurance is in the "catchall" category of casualty insurance, thus placing it within the scope of the Washington Insurance Guaranty Association Act.

 In anticipation of this conclusion, WIGA argues that the monetary amounts that Sea–First and American Leasing seek are not properly documented and that further discovery is necessary. WIGA complains that the insureds moved for summary judgment before their financial officers were deposed. WIGA also contends, for the first time on appeal, that Sea–First is improperly seeking a recovery for unpaid premiums. Because the argument regarding unpaid premiums is not supported by legal authority, we will not consider it here.[24]

We also will not resolve the issue of damages in this court. The trial court did not reach that issue in granting summary judgment in favor of WIGA on what is essentially the issue of coverage under the WIGA Act. The summary

---

[21]RCW 48.32.020.

[22]*State v. Sommerville,* 111 Wn.2d 524, 535, 760 P.2d 932 (1988); *Queets Band of Indians v. State,* 102 Wn.2d 1, 5, 682 P.2d 909 (1984).

[23]RCW 48.32.910.

[24]RAP 10.3(a)(5); *State v. Leach,* 113 Wn.2d 679, 699, 782 P.2d 552 (1989).

judgment in favor of WIGA must be reversed and the case remanded to the trial court for determination of the damages to be awarded Sea–First and American Leasing.

ISSUE TWO.

CONCLUSION. Sea–First is entitled to reasonable attorneys' fees and expenses because of the provision for fees and costs in its agreement with Integrity and because this suit is an action based on the insurance contract.

Sea–First's agreement with Integrity provided for the recovery of all costs and attorneys' fees incurred to enforce any obligation under the policy. While the American Leasing agreement contained no such provision, both insureds argue that they are entitled to an award of costs and attorneys' fees. They support their argument by citing RCW 48.32.060(1)(b), part of the WIGA Act. This statutory provision declares that WIGA shall

> Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.

RCW 48.32.060(1)(b). The Court of Appeals recently interpreted this statute to mean that the act "thus contemplates that WIGA will step into the shoes of the insolvent insurer."[25] Whether such a broad conclusion is literally true in all respects, we need not determine here.

Sea–First and American Leasing also cite several cases in which other state insurance guaranty associations were found liable for attorneys' fees. The Fifth Circuit held that the Louisiana Insurance Guaranty Association could be responsible for an insured's attorneys' fees and costs in *Deshotels v. SHRM Catering Servs., Inc.*, 842 F.2d 116, 120 (5th Cir. 1988). As support, the court cited a Louisiana insurance guaranty association statute that mirrors RCW 48.32.060(1)(b), cited above. The court also observed that

---

[25]*Washington Ins. Guar. Ass'n v. McKinstry Co.*, 56 Wn. App. 545, 549, 784 P.2d 190, *review denied*, 114 Wn.2d 1017 (1990); *see also Prutzman v. Armstrong*, 90 Wn.2d 118, 121, 579 P.2d 359 (1978) (function of WIGA is to step into the shoes of an insolvent insurer to protect state residents affected by the insolvency).

the Louisiana statute establishing the guaranty association law was to be

> "liberally construed to effect the purpose" of protecting claimants from financial loss or delays in compensation due to an insurer's insolvency, which would be defeated by making the claimant bear the interest and costs he incurred in prosecuting his claim.

(Footnotes omitted.) *Deshotels,* at 120. The law cited is very similar to RCW 48.32.910 of the WIGA Act. Equivalent state guaranty association statutes were also held to support an insured's claim for costs and fees against Florida's guaranty association in *Zinke–Smith, Inc. v. Florida Ins. Guar. Ass'n,* 304 So. 2d 507, 510 (Fla. Dist. Ct. App. 1974).

WIGA maintains that American Leasing is not entitled to attorneys' fees because there was no attorneys' fees provision in its agreement with Integrity. WIGA also would prohibit Sea–First from receiving attorneys' fees on the ground that this suit is not an action to enforce rights under the Integrity policy, but a determination of the scope of RCW 48.32.020, which lists the types of insurance to which the WIGA Act applies.

■■ We agree that American Leasing is not entitled to attorneys' fees because of the absence of a fee proviso in its agreement with Integrity. Regarding WIGA's argument that this action concerns the legal interpretation of RCW 48.32.020 and is not an action on the contract, it should be pointed out that both *Deshotels* and *Zinke–Smith,* cited above, also concerned issues of statutory interpretation. At issue in *Deshotels* was whether the claim involved was ocean marine insurance, which was excluded from guaranty association coverage.[26] At issue in *Zinke–Smith* was whether an unpaid claim was reinsurance which cannot

---

[26]*Deshotels v. SHRM Catering Servs., Inc.,* 842 F.2d 116, 118 (5th Cir. 1988).

qualify as the direct insurance covered by Florida's guaranty association act.[27]

Under Washington law, for purposes of a contractual attorneys' fee provision, an action is on a contract if the action arose out of the contract and if the contract is central to the dispute.[28] Here, the Integrity agreements are the source of this action and central to the dispute. To determine whether the agreements constitute credit or surety insurance, one must look at their provisions and the risks they insure. We thus conclude that this is an action on the contract and that Sea–First is accordingly entitled to reasonable attorneys' fees.

The summary judgment in favor of WIGA on the issue of coverage under the Washington Insurance Guaranty Association Act is reversed and the case is remanded to the trial court for determination of damages. Appellant Sea–First is entitled to attorneys' fees and expenses in accordance with the provisions of RAP 18.1.

DORE, C.J., UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

---

[27]*Zinke–Smith, Inc. v. Florida Ins. Guar. Ass'n*, 304 So. 2d 507, 509 (Fla. Dist. Ct. App. 1974).

[28]*Hemenway v. Miller*, 55 Wn. App. 86, 99, 776 P.2d 710, *review granted*, 113 Wn.2d 1016 (1989); Reporter's note: *reversed on other grounds* at 116 Wn.2d 725, 807 P.2d 863 (1991); *Western Stud Welding, Inc. v. Omark Indus., Inc.*, 43 Wn. App. 293, 299, 716 P.2d 959 (1986).